UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICK BAKER & SONS INC, | ) | |
| | ) | 3:17-cv-0664 (RAR) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ST. KILLIAN CANDLE CO. LTD, | ) | February 3, 2023 |
| | ) | |
| Defendant. | ) | |

**RULING**

I.  **BACKGROUND**

The plaintiff, Patrick Baker & Sons, Inc. filed this lawsuit against the defendant, St. Killian Candle Company, Ltd, alleging breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. (Dkt. #1.) The case was initially filed in Connecticut Superior Court but then removed to the United States District Court for the District of Connecticut. (Dkt. #1 and #1-2.)  The case was transferred to the undersigned on August 5, 2021.  (Dkt. #166.) On August 17, 2021, the parties informed the Court that the case was ready for trial. (Dkt. #168 and #169.) A bench trial was held from November 30 through December 3, 2021. (Dkt. #170.) Thereafter, the parties submitted post-trial briefs on January 24, 2022.

Prior to issuing this ruling, the Court reviewed Plaintiff's Pretrial Memorandum, all of the trial transcripts and exhibits, and the parties' post-trial briefs. The Court has carefully

1

weighed the evidence as well as the credibility of the witnesses.

## II.  __FACTS__

### *The Parties*

Patrick Baker & Sons, Inc. is a family-owned business located in Southington, Connecticut. (Dkt. #179 at ¶1.)  The company was started in 1965 by Jack Lennon and Patrick Baker under the name Lennon Baker. (Tr. 11/30/21 at 24-25.) Several years later, Patrick Baker purchased Jack Lennon's interest and the company became Patrick Baker & Sons (hereinafter referred to as "PB&S"). (Tr. 11/30/21 at 25.)  PB&S has been marketing, selling and distributing various types of candles, including votive candles, candle glass, sacramental wines, and clerical clothing for over fifty-five years. (Dkt. #179 at ¶2; Tr. 11/30/21 at 28.)

For many years, St. Patrick's Cathedral in New York City purchased church-related products from PB&S.  (Dkt. #179 at ¶3.) PB&S also had many customers in New York City, New Jersey and throughout New England. (Tr. 11/30/21 at 34.)

St. Killian Candle Company Limited ("St. Killian") is an Irish company which was founded in 2009 by Michael Baker and Michael Murphy. (Dkt. #180 at ¶3 and ¶5; Tr. 12/3/21 AM at 16.) St. Killian manufactures, distributes, and sells votive candles and candle racks to cathedrals, churches and shrines. (Dkt. #180 at ¶14; Tr. 12/3/21 AM at 12.)

2

Michael Barrett and Michael Murphy invented the "St. Killian's Candle Burning System."  (Tr. 12/3/21 AM at 13-15; Dkt. #180 at ¶6.) Under the system, the votive candle burns for approximately 60-90 minutes inside a patented glass. (Tr. 12/3/21 AM at 13-16; Dkt. #180 at ¶6.) The system was designed to allow churches to burn candles without causing smoke or fire damage. (Tr. 12/3/21 AM at 13-16; Tr. 12/3/21 PM at 45; Dkt. #180 at ¶6 and ¶9.) The candle does not emit any smoke or soot. (Id.) Once the candle finishes burning, the remaining wax falls through a hole and into a tray of water inside the candle rack. (Tr. 12/3/21 AM at 14-15; Dkt. #180 at ¶8.) The wax in the water hardens and can be removed easily. (Tr. 12/3/21 AM at 16-17; Dkt. #180 at ¶8.)

At its inception, St. Killian conducted business primarily in Ireland and Europe. (Tr. 12/3/21 PM at 41-42; Dkt. #180 at ¶15.) Eventually, St. Killian became interested in expanding into the United States. (Tr. 12/3/21 AM at 14-17.) At some point, St. Killian learned about PB&S and became interested in exploring a potential business relationship. (Dkt. #180 at ¶19.) St. Killian was aware that PB&S was supplying ecclesiastical products to several churches and cathedrals, including most prominently St. Patrick's Cathedral. (Tr. 12/3/21 AM at 21.)

### *St. Killian and PB&S Meet Each Other*

At all times relevant, Michael Baker has been an owner of PB&S. (Tr. 11/30/21 at 29.) Around April of 2010, Patrick Kelly,

who is Mr. Baker's nephew, told Mr. Baker that he had met someone from St. Killian. (Tr. 11/30/21 at 39-42.) After Mr. Kelly described St. Killian's product, Mr. Baker thought it could be a great opportunity. (Tr. 11/30/21 at 39-40.)

Thereafter, on April 20, 2010, Mr. Baker received a phone call from Jim Ryan, a broker for St. Killian.  (Tr. 11/30/21 at 39.) The phone call lasted five to seven minutes. (Tr. 11/30/21 at 40.) Since Mr. Baker had a pre-planned trip to Ireland, he and Mr. Ryan agreed to meet in Ireland. (Tr. 11/30/21 at 39-40.)

Later that day, Michael Murphy, from St. Killian, sent an e-mail to Mr. Baker telling him that he (Murphy) had spent a day at St. Patrick's Cathedral, and noticed that the Cathedral burned a lot of candles and some of the candle glasses had exploded. (Exh. 5.) Mr. Murphy told Mr. Baker that

> Our system is completely safe as it has an inner glass which sits into an outer glass the candle sits into the inner glass burns for approx. 2 hours.  When the candle is finished burning the waste drops into a tray of water or Teflon.

> We can show you during your visit to Ireland next month.

(Exh. 5.)

Thereafter, a meeting was held in Ireland. (Tr. 12/3/21 AM at 21.) Michael Baker attended on behalf of PB&S, and Jim Ryan, Michael Barrett, and Michael Murphy attended on behalf of St. Killian. (11/30/21 at 43.)  The representatives of St. Killian showed Mr. Baker their candle rack, which was setup in a van,

and the candles were already burning when Mr. Baker arrived. (11/30/21 at 44-45; Tr. 12/3/21 AM at 21-22.) Mr. Baker was very impressed because the candles were burning in a closed environment, but he did not smell any smoke or carbon. (11/30/21 at 45.)  Mr. Baker testified that the pollution in St. Patrick's Cathedral was incredible due to the carbon buildup, so he was extremely interested in St. Killian's product. (11/30/21 at 48.) During the meeting, the parties discussed how much money they could make together. (11/30/21 at 48.)

After returning to the United States, Mr. Baker told his family business members that there was a new innovative product line that could benefit the business, and they agreed that St. Killian's product could help St. Patrick's Cathedral and also PB&S' other accounts. (11/30/21 at 49.)

### *PB&S and St. Killian Start Working Together and Discussing a Business Relationship*

On May 27, 2010, Michael Baker received an e-mail from St. Killian, in response to his own inquiry, which briefly summarized what St. Killian was hoping to accomplish with PB&S' assistance. (Exh. 6.) Among other things, the e-mail stated that St. Killian's votive candle racks were made in Ireland, but St. Killian would be very interested in exploring manufacturing possibilities. (Id.) The e-mail stated that the next possible step would be for St. Killian's representatives to visit with

Mr. Baker and his team. (Id.) The e-mail stated that PB&S "will benefit from every candle sold in the North American Market" and concluded by proposing a meeting in July of 2010. (Id.)

On June 5, 2010, Mr. Murphy e-mailed Mr. Baker and told him that it was expensive to manufacture the candles in Ireland and then transport them to the United States, so it would be best to get the candles made in the United States in the future. (Exh. 7.) Mr. Murphy also said that St. Killian wanted "Bakers to be Killians USA and every candle sold [by PB&S] should get commission just like our agent Jim Ryan. . . ." (Id.) Mr. Baker testified that, based on conversations, he understood that being "Killians USA" meant that PB&S would be able to take St. Killian's product line, market it, manage it, and ship it to PB&S' churches and dealers. (Tr. 11/30/21 at 63.)

During the Summer of 2010, a St. Killian candle rack was being shipped to the United States and PB&S was going to place it in a church with whom PB&S had a fantastic relationship – St. Malachy Roman Catholic Church (hereinafter referred to as "St. Malachy."). (Tr. 11/30/21 at 63-64.) Around the same time, St. Killian and PB&S talked about a manufacturer that could help make St. Killian's candle rack look better. (Tr. 11/30/21 at 65-66; Exh. 8.)

On July 15, 2010, Mr. Barrett and Mr. Murphy traveled to Connecticut to meet with Michael and Sean Baker. (Tr. 11/30/21

at 68; Tr. 12/3/21 AM at 22-23.) The co-founder of PB&S, Patrick Baker, was also present, and he told Mr. Barrett that in his fifty years in the business, he had not seen anything like the St. Killian votive candle. (Exh. 9.)

On July 20, 2010, Mr. Barrett sent an e-mail to Michael Baker outlining the topics they had discussed during their meeting on July 15. (Id.) The e-mail mentioned ten items, including:

- St. Killian intended on manufacturing candles in the United States in the future;

- PB&S would help St. Killian with the roll out to other dealers in the United States and would receive ½ of a cent (U.S.D.) on all candles sold in the United States;

- St. Killian hoped to have the candle racks made in the United States with a manufacturer that PB&S knew ("PEP"), and PB&S would get a commission on those sales; and

- PB&S would try to convert St. Patrick's Cathedral to the St. Killian's candle burning system. (Id.)

By July 2010, PB&S was serving as a dealer for St. Killian, which means that PB&S was purchasing candles from St. Killian and selling them to PB&S' customers. (Tr. 12/3/21 PM at 2-3 and 5.) In exchange, St. Killian supplied PB&S with the patented inner glass free of charge. (Tr. 12/3/21 PM at 3.) PB&S could mark up St. Killian's products and sell them to customers for

7

profit. (Tr. 12/3/21 PM at 3.) PB&S was St. Killian's first authorized dealer in the United States. (Tr. 12/3/21 PM at 5.)

### PB&S helps St. Killian with St. Patrick's Cathedral

At all times relevant, Kevin Donohue was the Director of Operations for St. Patrick's Cathedral. (Tr. 12/2/21 at 88.) Mr. Donohue oversaw all operations and vendors for St. Patrick's Cathedral. (Tr. 12/2/21 at 88.)

On July 21, 2010, Sean Baker sent an e-mail to Mr. Barrett informing him that he (Baker) brought Kevin Donohue to St. Malachy to demonstrate how St. Killian's candle burning system worked. (Exh. H.). Sean Baker told Mr. Barrett that, after seeing St. Killian's system at St. Malachy, Mr. Donohue was excited to show the burning system to Monsignor Ritchie, who was the Monsignor of St. Patrick's Cathedral. (Id.) Sean Baker's e-mail stated that Monsignor Ritchie had just seen the burning system for himself that day and was equally impressed. (Id.) Sean Baker informed Mr. Barrett that St. Patrick's Cathedral was interested in getting its own test rack. (Id.)

On August 16, 2010, Mr. Barret sent an e-mail to Sean Baker following up on the ten items that were mentioned in the e-mail dated July 20, 2010. (Exh. 12.)  Mr. Barrett's e-mail informed Sean Baker that St. Killian "will prepare draft copies [of contracts] for us to navigate through and come up with the best for a long-term business relationship." (Id.)

With Sean Baker's assistance, a test rack was installed in St. Patrick's Cathedral on October 4, 2010. (Exh. N.)  The parties agree that St. Killian's burning system was well-received. (Id. at 2-3.)

### *St. Patrick's Cathedral Stops Doing Business with PB&S*

As Director of Operations, Kevin Donohue oversaw the invoicing for all vendors of St. Patrick's Cathedral and gave approval for work. (Tr. 12/2/21 at 88.)  At all times relevant, Mr. Donohue reported to Monsignor Ritchie, who was the head of the Cathedral. (Tr. 12/2/21 at 88.)

When Mr. Donohue became the Director of Operations, St. Patrick's Cathedral was ordering its church supplies, including candles and glass, from PB&S. (Tr. 12/2/21 at 93, 96.)  After becoming Director of Operations, Mr. Donohue implemented a change within the Cathedral requiring anyone who wanted to order items from a vendor to get Mr. Donohue's approval. (Tr. 12/2/21 at 94, 137.)

Mr. Donohue usually dealt directly with Sean Baker when dealing with PB&S. (Tr. 12/2/21 at 96.) Sean Baker testified that Mr. Donohue constantly complained about pricing on most anything, and not just the price of candles. (Tr. 11/30/21 at 152.)  According to Sean Baker, Mr. Donohue was known for complaining about pricing. (Tr. 11/30/21 at 152-52.)

Shortly after Mr. Donohue became Director of Operations, St. Patrick's Cathedral was preparing for a major renovation that would take about five years and cost around $200,000,000. (Tr. 12/2/21 at 96-98, 144.)  The church was going to be closed and there was a concern that the lack of revenue might lead to layoffs, so Mr. Donohue explored cost-cutting measures. (Tr. 12/2/21 at 96-98.) Mr. Donohue determined how much money the Cathedral was paying vendors and suppliers by examining the Cathedral's monthly expenses for electricity, water, glass, telephones, etc. (Tr. 12/2/21 at 97-101, 137.)

Regarding the cost of candles, Mr. Donohue Googled candle companies to determine how much they charged for candles. (Tr. 12/2/21 at 96-97.) One of the candle companies was called A. Gross Candles Company (hereinafter referred to as "AGCC"). (Tr. 12/2/21 at 96.) Mr. Donohue compared PB&S' prices with AGCC's prices and concluded that there was a significant difference on an annual basis. (Tr. 12/2/21 at 103.) Mr. Donohue concluded that AGCC charged about half of what PB&S charged for glass for the votive candles. (Tr. 12/2/21 at 103-04, 111, 153.)

Based on this analysis, Mr. Donohue concluded that PB&S' prices were higher than AGCC's prices and that the Cathedral would save money by switching companies. (Tr. 12/2/21 at 104.) Mr. Donohue informed Monsignor Ritchie who, in turn, made the final decision. (Tr. 12/2/21 at 104, 106.) The Cathedral decided

to stop buying votive candles and other products from PB&S. (Tr. 12/2/21 at 104.) The Cathedral started buying candles and glass for the votive candles from AGCC. (Tr. 12/2/21 at 111.) Mr. Donohue informed Sean Baker of the Cathedral's decision. (Tr. 12/2/21 at 106.) Mr. Donohue told Sean Baker that Monsignor Ritchie made the decision and it was based on price. (Tr. 12/1/21 at 12; Tr. 12/2/21 at 106.)

When Mr. Donohue began his cost-cutting measures, St. Patrick's Cathedral had eight to ten vendors. (Tr. 12/2/21 at 88, 138.) However, only one vendor -- the plumbing company – survived the cost-cutting measures. (Tr. 12/2/21 at 145.) Monsignor Ritchie was the final decision-maker for all the cost-cutting measures. (Tr. 12/2/21 at 107.)

Although none of the witnesses could provide an exact date as to when St. Patrick's Cathedral stopped doing business with PB&S, Sean Baker testified that it was about three to four months prior to February of 2011, which would be around October or November of 2010. (Tr. 12/1/21 at 12-13.)

### St. Killian Learns of the Cathedral's Decision to Stop Doing Business with PB&S

St. Killian learned of the Cathedral's decision to stop doing business with PB&S in late 2010, when Mr. Donohue informed St. Killian of the Cathedral's decision. (Tr. 12/3/21 PM at 7-8.) Although Mr. Donohue gave St. Killian an explanation for the

decision, the explanation did not dissuade St. Killian from moving forward with the plan to make PB&S St. Killian's exclusive distributor for New England. (Tr. 12/3/21 PM at 9.) As the contemporaneous correspondence shows, St. Killian and PB&S continued discussing a business arrangement even after St. Patrick's Cathedral stopped doing business with PB&S. (Tr. 12/3/21 at 9.)

### *PB&S continues to work with St. Killian and discuss potential contract terms; St. Killian also tries to help PB&S get back into St. Patrick's Cathedral*

On February 8, 2011, Sean Baker e-mailed Michael Baker and told him that "St. Killians continues to move forward with negotiations at St. Patrick[']s Cathedral. . . This will be Bakers key to getting back doing business at St. Patrick's even if it is built in commission for every candle burned at St. Patrick's. . . ." (Exh. Q) By the date of the e-mail, PB&S was no longer involved with the project at St. Patrick's Cathedral. (Tr. 12/1/21 at 13.)

On March 4, 2011, Sean Baker sent another e-mail to Michael Baker advising him that a meeting with St. Killian on March 3, 2011 "went very well." (Exh. R.) After noting that St. Patrick's Cathedral had three candle racks and was planning on getting five more racks in the summer, Sean Baker's e-mail purported to summarize the most important points that were discussed during

the meeting with the representatives from St. Killian.  The
first point was summarized as follows:

> #1 Baker has exclusive distribution rights for all of
> New England.  Connecticut and Massachusetts would be our
> most concentrated area while we can determine who can be
> a dealer in Maine, NH and Vermont, if we want to name a
> dealer at all. This term has been agreed to and will be
> put in writing.

(Id.)

After mentioning two other items, Sean Baker's e-mail ended
by saying "[t]hings are moving very quickly for this young
company but <u>we all agree to try and not make hasty decisions and
to get this done correctly</u>.  I will keep you informed as I know
more. . . ."  (Id.)(emphasis added.)

On July 26, 2011, Michael Barrett e-mailed Sean and Michael
Baker and stated

> I would like to follow up on our most recent conversation
> with regards to the working relationship that both our
> companies are about to undertake. As I have confirmed
> with you on the phone we are in the process of having
> U.S. lawyers who are from Boston draw up the contract
> for both of our companies. We are exploring all of what
> we have discussed with both Michael Baker and Sean Baker
> at our latest meeting in New York with our lawyers to
> draw up what will be practical and fit for purpose with
> regard for U.S. law and in conjunction with Irish law.

(Exh. U.)

On October 28, 2011, Mr. Barrett and Mr. Murphy met with
Sean and Michael Baker.  After the meeting ended, Sean and
Michael Baker wrote a memo summarizing the discussions. (Exh.
W.)  Regarding St. Patrick's Cathedral, the memo stated

It is becoming quite clear as time goes by how much [PB&S] has been financially hurt by the loss of the St. Patrick's Cathedral Candle [account]. It is going to be vitally important for [PB&S] to in someway be a part of the long-term financial consideration with regards to St. Patrick's.  The question remains, how can [PB&S] regain any type of lost revenue to lessen or eliminate lost revenue at St. Patrick's.

<u>2 options to consider</u>

A. Once again establish a working relationship to be the primary dealer. Stock, deliver, invoice, service racks.

B. Be a servicing agent that delivers candles and keeps racks in top shape but does not invoice, negotiate price. We would be on call for all needs in regards to the St. Killian product at St. Patrick's Cathedral. For this service we would receive a commission that will be determined later.

(Exh. W at 1.)

Regarding PB&S' role as St. Killian's dealer in the United States, the memo stated

It was initially discussed that [PB&S] would help St. Killian's attract and market the product to other dealers in the U.S. market. Dealers who would have had a long standing and trusting relationship for decades. For these efforts it was discussed that [PB&S] would receive ½ cent per candle for candles sold by dealers.

If this is not to be the case why not and what would be considered a fair and attractive alternative plan?

<u>Suggested alternative plan</u>

*[PB&S] receives vastly lower pricing than the rest of the U.S. market.

*[PB&S] receives ½-1 cent on all dealers candle sales in the New England and Tristate area as well as Maroney's and all original group members.  The dealers would be.

[*list of 19 dealers omitted*]

14

In conclusion, [PB&S] is very proud of what we have done
to help St. Killian Candle company achieve in just this
short amount of time.  We are extremely motivated to
convert as many Cathedrals, Churches, Chapels as we move
forward in partnership with St. Killians and all the
other dealers in the U.S. We feel that the consideration
of this compensation package would only enhance the
motivation and excitement.  Thank you for your careful
consideration.  Thank you.

Kindest regards,
Sean Baker
Michael Baker

(Exh. W.)

At some point, St. Patrick's Cathedral stopped buying

traditional candles from AGCC and switched to the St. Killian

candle racks.[1] (Tr. 12/2/21 at 114-16) St. Patrick's Cathedral

became a "factory direct house account" for St. Killian, meaning

the account belonged to St. Killian, not PB&S. (Tr. 11/30/21 at

96.)  On November 11, 2011, Sean Baker sent an e-mail to Mr.

Donohue, stating

Just want to drop a line about how nice the Cathedral
looks with the new Votive stands in place. Sincere
congratulations on taking a concept we spoke about 2
years ago and getting it pushed over the finish line. .

---

[1] Mr. Donohue was hesitant to switch from AGCC to St. Killian because
they would need to redesign the whole system to match the Cathedral
and he was worried about how the regular visitors might respond to the
change. (Tr. 12/2/21 at 116-17.) Additionally, the owners of Cathedral
Candle visited Mr. Donohue and tried to get the business. (Tr. 12/2/21
at 117-19.) Since Cathedral Candle was an American company, and Mr.
Donohue did not know the owners of St. Killian, he gave Cathedral
Candle 60 days to make a proposal, but he ultimately declined it. (Tr.
12/2/21 at 118-19.) Mr. Donohue's testimony establishes that, when St.
Patrick's Cathedral stopped doing business with PB&S, the Cathedral
did not switch to St. Killian and St. Killian was never a shoo-in.

> . . . <u>I understand that the votive account is a factory direct house account between you and St. Killian's which I think is the best way to work that</u>. I hope that you and [Monsignor] Ritchie could reconsider doing some business with me in the future.  I can guarantee you both the very best prices and service moving forward. Thank you and all the best.

(Exh. X)(emphasis added.) Mr. Donohue's reaction to Sean Baker's e-mail was that the e-mail illustrated why the Cathedral stopped doing business with PB&S. (Tr. 12/2/21 at 116.) As Mr. Donohue noted, the e-mail said moving forward I will give you the best prices, as opposed to saying I always tried to give you the best prices. (Tr. 12/2/21 at 116.) Mr. Donohue never responded to Sean Baker's e-mail. (Tr. 12/2/21 at 115-16.)

### *St. Killian and PB&S Enter into a Written Agreement*

On January 28, 2012, Sean and Michael Baker visited Mr. Barrett and Mr. Murphy in Ireland, and the parties entered into a written agreement. (Exh. A.)  The agreement was signed by all four individuals. (Id.)

The agreement provides that PB&S will be the exclusive distributor for St. Killian within New England.[2] (Id.) Mr. Barrett testified that St. Killian has never given exclusive distribution or dealership rights to anyone but made an exception for PB&S. (Tr. 12/3/21 PM at 14 and 73.)  As an

---

[2] The parties have stipulated that New England includes six states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. (Dkt. #177 at 17.)

exclusive distributor, PB&S would have no competition from St. Killian within New England. (Tr. 12/3/21 PM at 72.) PB&S would also receive a special price of 8.5 Euro cent for each St. Killian candle. (Exh. A, p. 1 at ¶3; Tr. 12/3/21 PM at 15.) Mr. Barrett testified that this special price was something St. Killian had not afforded to any other dealer in the United States. (Tr. 12/3/21 at 15.)

The written agreement requires PB&S to achieve 250 candle racks in churches within New England by the end of 2012. (Exh. A.) Mr. Barrett testified that St. Killian made PB&S the exclusive distributor in New England, "in return for [PB&S] achieving an amount of sales for both PB&S and customers." (Tr. 12/3/21 PM at 15-16.) Mr. Barrett explained that since New England is a large area, he asked Michael and Sean Baker "to come up with a really realistic figure as to what they thought they could achieve to sell in that area in 2012 and the ways they might achieve it." (Tr. 12/3/21 PM at 16.) Michael and Sean Baker asked if they could appoint their own dealers in New England to help them meet the requirement, and St. Killian said yes. (Tr. 12/3/21 PM at 15-16.) Therefore, the agreement specifically provides that PB&S could appoint dealers within New England. (Exh. A.)

The written agreement provides that, outside of New England, PB&S would serve as a representative of St. Killian.

17

(Id.) PB&S agreed to target the top cathedrals and shrines throughout the United States. (Id.) St. Killian would arrange a mailing, which would include a full color brochure and DVD, as well as a cover letter to all churches and cathedrals provided by PB&S. (Id.) St. Killian would then forward all active leads generated through this campaign to PB&S. (Id.)  PB&S would then be responsible for actively pursuing and ultimately closing those leads. (Id.)  PB&S would receive all profits over 13.5 U.S. cents per candle with the understanding that the price per candle should not exceed 23 U.S. cents per candle. (Id.)  As noted in the agreement, "[t]his is a 9.5 cent profit per candle to [PB&S] for all sales outside of New England."  (Id.)

At the end of the agreement, there is a handwritten note which states "[n]ew agreement on .1 per candle for St. Patrick's Cathedral will follow."  (Id.) Michael Baker inserted the note before anyone signed the agreement. (Tr. 11/30/21 at 80 and 87.) At trial, Mr. Baker explained that he inserted the handwritten note because "there really wasn't anything on that, you know, for St. Patrick's Cathedral.  We were trying to, at least after losing that account, that you did 350 thousand a year with when you lost that completely, we were hoping to get just something out of that deal." (Tr. 11/30/21 at 80.)

On February 9, 2012, Sean Baker sent an e-mail to Michael Murphy stating

18

> I have a quick question in regards to the points we all
> agreed upon during our visit. One of the agreements is
> that [PB&S] will receive 1 cent per candle for St.
> Patrick's Cathedral.  This will continue until we are
> really running smoothly with the rest of the country.
> The questions we have are #1 when would these payments
> be distributed, Monthly/ Quarterly/ twice a year?
> Whatever works best for St. Killian's end is agreeable.
> The other option would be to credit the commissions
> toward product that is on order.  This is really the
> only agreement that we left open before we left,
> everything else is very clear.  Thanks for your help.

(Ex. CC.)

On February 15, 2012, Michael Murphy responded by stating

> As discussed, you will initially receive USD $0.01 (1
> U.S. cent) for every candle sold to St. Patrick's
> Cathedral in recompense for your help with the St.
> Patrick's Cathedral account and in particular for
> collecting and recycling their waste wax. We
> would suggest that we will calculate the commission quarterly
> and offset the amount due against amounts owing by you
> on your account at that time.

(Exh. EE.)

On February 15, 2012, Sean Baker replied to Mr. Murphy's e-mail, but said nothing about Mr. Murphy's statement that the payment of one cent per candle would be tied to the collection of the waste wax at St. Patrick's Cathedral. (Exh. FF.)

On February 25, 2012, Mr. Murphy sent another e-mail to Sean Baker, which was copied to Michael Baker. (Exh. HH.)  The subject line of the e-mail was "waste wax." (Id.)  The e-mail stated, in relevant part

> It is great news in regards to the waste wax Sean in
> reply to your question of the wax from St. Patrick's
> Kevin was to organise [sic] the large bin bags for the

bins that they use and he was to let us know I will send
him an Email and see if he has this done.

Once he has the bags we are ready to rock and start
getting things moving to have the wax collected every
week.

We don't have any of the very large bags Sean. Sorry.

(Id.)

On February 26, 2012, Sean Baker replied to the message.
(Exh. II.)  In response to Mr. Murphy's comments about the
collection of the waste wax, Mr. Baker said "I am still waiting
to hear from the wax salvage companies.  I will also wait to
hear from you about St. Patrick's.  That's it for now.  Looking
forward to getting things going." (Id.) From that point forward,
none of the e-mails that the parties exchanged mentioned any
further need to discuss, clarify, or finalize the "new agreement
on .1 per candle" that was referenced in the handwritten note in
the signed agreement.

### *PB&S Reorganizes and Forms a New Management Team*

Both before and after the parties signed their written
agreement on January 28, 2012, PB&S continued to experience
financial difficulties due to the loss of the St. Patrick's
Cathedral account. (Tr. 11/30/21 at 92; Exh. W.) PB&S had
trouble paying invoices in a timely fashion and this continued
throughout the summer and fall of 2012. (Tr. 11/30/21 at 94-97.)

On July 28, 2012, Sean Baker e-mailed Mr. Barrett and Mr. Murphy to inform them that PB&S had recently reorganized. (Exh. LL.) The e-mail stated that David Threlkeld and his wife Mary had joined the management team as investors and consultants.[3] The new management team consisted of Sean and Michael Baker, David and Mary Threlkeld, and Maureen Kelly, who is the sister of Sean and Michael Baker. (Exh. LL; Tr. 12/2/22 at 18) The e-mail advised St. Killian that the goal of the reorganization was to make PB&S run in the most efficient and profitable manner possible. (Exh. LL.) Sean Baker suggested that the parties should get together when Mr. Murphy and Mr. Barrett next traveled to the United States. (Id.)

On September 8, 2012, Sean Baker sent another e-mail to Mr. Murphy and Mr. Barrett.  (Exh. OO.) The subject line of the e-mail was "Business plan for [PB&S] / St. Killian" and the e-mail stated that it was intended only to deal with the business of PB&S moving forward with St. Killian as exclusive dealer of New England. (Id.) The e-mail said, moving forward, here is what needs to be done: "Let's get the current PBS/ St. Killian balance to $0. Distribute commissions due to [PB&S] for work/ travel/ etc. for both Atlanta & St. Paul, Minnesota.  If there

---

[3] David Threlkeld is Sean and Michael Baker's brother-in-law and is married to their sister Mary. (Tr. 11/30/21 at 97.) Mr. Threlkeld and his wife loaned PB&S $500,000 and they acquired an ownership interest. (Tr. 11/30/21 at 98; Tr. 12/2/21 at 17-18, 20.)

is a balance left if any will be paid by PB[&]S." (Id.) Next, the e-mail stated that the companies should "[s]olidify a plan for the distribution and payment of racks." (Id.) The e-mail then proposed two options for the payment of racks. (Id.) The e-mail further stated that PB&S would need a lot of candles so "[l]et's come up with terms that are comfortable with both businesses." (Id.) At the end of the e-mail, Sean Baker explained that he wanted to get things sorted out with PB&S because he was working with PB&S' management team and needed to provide answers. (Id.)

Thereafter, on September 14, 2012, Mr. Murphy sent an e-mail to Sean Baker which stated that he (Murphy) was aware that Mr. Barrett was speaking to Mr. Baker about Mr. Baker's e-mail from September 8 and that the two of them were discussing the best way for PB&S and St. Killian to move forward. (Exh. RR.) The e-mail stated

> let's start fresh we have calculated that the commissions due to [PB&S] is $17,347.00 for the racks and candles that were delivered and installed in ATLANTA and MINNESOTA. The current balance that [PB&S] owes to Killians is $21,125.14 less commissions due of $17,347.00 leaving a balance of $3,778.14.
>
> This balance Sean of $3,778.14 has to be paid by [PB&S] to close this invoice so we can move forward with the next container. I expect this small balance to be paid immediately so we can proceed and move on.

(Id.)(emphasis added.)

Later that day, Sean Baker responded by stating

With regards to PB&S I am now part of a management team as you know.  I have to say it is going well but <u>I no longer call the shots exclusively</u>.  <u>I think from prior discussions we have had you can appreciate my new position. David Threlkeld has taken over the accounting and financial management of the company</u>. He has been around many businesses and has seen the good, the bad & the very ugly. I can tell you from all of the dozens of questions that he has asked that he is very interested and intrigued by the Killian product and it's potential. <u>I have of course along with Mike B. been your strongest advocate in explaining the finer points and potential for Killian / PBS in New England</u>.

<u>What I have come to realize with David is that he needs compete [sic] and precise understanding of business relationships before he is willing to finance them</u>. This is why the person to person meeting on your next trip to the U.S. will be so important. David has asked me the [sic] nail down the finer points of our agreement so that we have an outline during our meeting.  This way we can wrap up the agreement details and really get going.

<u>We next meet as a group on Monday morning at which time I will present what you explained here in this e-mail with regards to the commissions and our remaining balance</u>.  I think the sooner we have exact figures for commissions on future racks the better.

(Id)(emphasis added.)

On the same day, September 14, 2012, St. Killian mailed a letter to PB&S informing PB&S that St. Killian was terminating the agreement dated January 28, 2012. (Exh. QQ.) The letter started by saying that "over the past number of months, we have informed you on numerous occasions by email and the phone on the position with [PB&S] outstanding balance and non-payment received to date." (Id.) The letter ended by immediately terminating the agreement dated January 28, 2012. (Id.) At the

time, PB&S owed St. Killian in excess of $26,000 and St. Killian
owed PB&S $13,000. (Tr. 12/3/21 at 75-76.)

### *PB&S and St. Killian Continue to Interact with Each Other After the Date of St. Killian's Termination Letter*

The parties disagree as to what happened after St. Killian
sent the termination letter. PB&S questions the authenticity of
the termination letter and argues that it is a fabrication.
(Dkt. #200, at 10 n. 5.) PB&S claims it never received the
termination letter and was never informed that the agreement had
been terminated. (Tr. 11/30/21 at 95, 111.) Mr. Threlkeld
testified that, after September 14, 2012, PB&S continued to
proceed as though the agreement was still in effect, and St.
Killian never said or did anything to make PB&S think otherwise.
(Tr. 12/2/21 at 39-40.) St. Killian asserts that it mailed the
termination letter and then the parties discussed whether they
would be able to do business with each other. (Dkt. 180 at ¶98.)

Wholly unrelated to the termination letter, PB&S "made a
decision to halt any business with [St. Killian]" in mid-
September of 2012. (Tr. 12/1/21 at 56-57.) Thus, PB&S stopped
moving forward with future orders from St. Killian. (Tr. 12/1/21
at 105-06.) PB&S' decision was based on a dispute it had with
St. Killian regarding a container that had been shipped months
earlier. (Tr. 12/1/21 at 55-56.) According to PB&S, when it
opened the container, candle racks were missing. (Tr. 12/1/21 at

55.) PB&S did not inform St. Killian of the alleged problem until several months later, when St. Killian was trying to collect money from PB&S.[4] (Tr. 12/3/21 at 34; Exh. LLL.) PB&S decided that it would stop ordering products from St. Killian until the discrepancy over the container was resolved. (Tr. 12/1/21 at 55.) PB&S never informed St. Killian of its decision to halt business with St. Killian. (Tr. 12/1/21 at 107.)

Despite the issues that each party had with the other in mid-September of 2012, the parties continued discussing how they could do business together. (Exh. BBB; Tr. 12/2/21 at 37-41.)

In late September or early October of 2012, the parties agreed to schedule a face-to-face meeting. (Exh. BBB at 4.) PB&S prepared an agenda for the meeting. (Id.) On October 11, 2012, Mr. Barrett sent an e-mail to Mr. Threlkeld thanking him for the proposed agenda and telling him "[w]e are looking forward to the new opportunity with PBS for New England." (Id.)(emphasis added.) Mr. Barrett stated that "there was one other point we talked about during our phone call, and perhaps you and your team could give this a little thought, coming with the

---

[4]According to Mr. Barrett, since PB&S waited several months before notifying St. Killian of the alleged problem, there was nothing St. Killian could do about it. (Tr. 12/1/21 at 35.) Mr. Barrett stated that St. Killian transports several containers each week but had PB&S provided timely notice of the situation, St. Killian could have investigated the situation and submitted a claim to its insurance company but, by the time PB&S informed St. Killian of the problem, it was too late to do anything. (Tr. 12/1/21 at 35.)

exclusivity for all of New England is the expectation of a minimum quantity of sales for that area." (Id.)

On October 19, 2012, Mr. Threlkeld sent an e-mail to Mr. Barrett telling him "[w]e have to tie up the loose ends so that the parties understand what they can expect from each other rather than attempt to operate on a vague best efforts basis which is the proverbial moving target." (Id. at 2)(emphasis added.) Mr. Threlkeld ended his e-mail by stating "[r]est assured that its PBS objective to make business relationships work and that is the goal we are working on with Killian." (Id. at 2.)

On October 21, 2012, in reference to a container that needed to be shipped and paid for, Mr. Barrett sent an e-mail to Mr. Threlkeld proposing an arrangement for splitting the cost. Mr. Barrett told Mr. Threlkeld that "until we can come to an agreement on the future of St. Killian and PBS, this is our suggestion for this container only." (Id. at 1)(emphasis added.)

On October 22, 2012, Mr. Threlkeld emailed Mr. Barrett and said "[w]e would like to do a phone conference or even Skype to go over the various details of the whole relationship and get an agreement in place which satisfies both parties." (Exh. CCC)(emphasis added.)

On October 23, 2012, Mr. Threlkeld e-mailed Mr. Barrett and told him that PB&S' management team wanted both companies to get

on the same page as quickly as possible but if Mr. Barrett thought nothing would go amiss before their meeting in November of 2012, so be it. (Exh. EEE.) Mr. Threlkeld's e-mail then stated "[i]n the interim we will rely on the agreement signed in Dublin during Mike and Sean's visit in January of this year." (Id.)(emphasis added.) At trial, Mr. Threlkeld testified that he never received a response from St. Killian telling him that the agreement, dated January 28, 2012, had been terminated so he and PB&S proceeded as though the agreement was still in effect. (Tr. 12/2/21 at 39-40.)

According to Mr. Barrett, the face-to-face meeting in November of 2012 did not go well. (Tr. 12/3/21 PM at 32-33.) He claimed that Mr. Threlkeld was very "aggressive" during the meeting and by the end of the meeting it was clear that St. Killian could not work with him. (12/3/21 PM pp. 32-34) Although the witnesses for PB&S deny receiving the termination letter or notice of the termination, they did not explain how or when the business relationship with St. Killian ended.

### III. DISCUSSION

#### A. Breach of Contact

"Because this federal court is sitting in diversity, Connecticut law governs." Roh v. Devack, No. 3:07-CV-1901 (CSH), 2009 WL 3347105, at *3 (D. Conn. Oct. 14, 2009). To prove a claim for breach of contract under Connecticut law, PB&S must

establish: (1) the existence of a contract, (2) a breach of the contract by the defendant, and (3) damages resulting from the breach. <u>Chem-Tek, Inc. v. General Motors Corp.</u>, 816 F. Supp. 123, 131 (D. Conn. 1993) (citing *O'Hara v. State*, 218 Conn. 628 (1991).

PB&S argues that there were two contracts in this case: (1) the written contract dated January 28, 2012, and (2) an implied contract that was formed prior to January 28, 2012. (Dkt. #200 at 2.)

    1. <u>The implied contract that was allegedly formed prior to January of 2012</u>.

> Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements.  It is elementary that to create a contract there must be an unequivocal acceptance of an offer.  The acceptance of the offer must be explicit, full and unconditional.  The burden is on Plaintiff to prove a meeting of the minds with respect to Plaintiff's version of the claimed contract. A contract cannot be enforced unless all essential terms have been sufficiently agreed upon.

<u>Roh v. Devack</u>, No. 3:07-CV-1901 (CSH), 2009 WL 3347105, at *3 (D. Conn. Oct. 14, 2009)(internal citations and quotations omitted). "Whether a contract exists is a question of fact for the court to determine." <u>Joseph Gen. Contracting, Inc. v. Couto</u>, 119 A.3d 570, 577 (Conn. 2015)(citation omitted).

In <u>Roh v. Devack</u>, No. 3:07-CV-1901 (CSH), 2009 WL 3347105, at *3 (D. Conn. Oct. 14, 2009), plaintiff Roh was the minority

shareholder in a company and defendant Devack was the majority
shareholder.  In 2004, Roh and Devack discussed a potential
buyout. During negotiations, Devack offered to buy Roh's shares
for $2,000,000 and Roh offered to buy Devack's shares for
$9,000,000. Roh followed up with an e-mail stating "In the
interest of saving time, if you decide not to take my offer [to
buy your shares for $9 million], I will go ahead and sell my
shares for $2.85 [million], which I believe is a fair
compromise." Id., 2009 WL 3347105 at *1.  On November 29, 2004,
Devack sent an e-mail stating "I agree to the $2.85 Million. We
will get back to you soon with what terms we can offer." Id. The
transaction was never completed. Devack claimed that he never
had any further discussions with Roh regarding what terms could
be offered.  Roh argued that an enforceable contract was formed
on November 29, 2004, and that summary judgment should be
granted in his favor. The Honorable Charles S. Haight denied the
motion for partial summary judgment and found that the plain
language of the e-mail militated against Roh's position. Judge
Haight noted that "[t]he email accepts the price term offered by
[Roh], but clearly contemplates that additional negotiation as
to other terms is still required, and advises [Roh] of such."
Id., at *3. Judge Haight further noted that

> it is not common practice to form contracts for $2.85
> million business deals on the basis of two sentence e-
> mails stating only the purchase price. "[W]here 'the

> memorandum appears [to be] no more than a statement of
> some of the essential features of a proposed contract
> and not a complete statement of all the essential terms,'
> the plaintiff has failed to prove the existence of an
> agreement."

Id. at *3 (citation omitted).

In this case, PB&S argues that the Court can find that the parties reached an agreement prior to January of 2012.  First, PB&S argues that the parties had a contractual relationship as of April of 2010. (Dkt. #200 at 6.) In support of this argument, PB&S notes that St. Killian told PB&S that it would be "Killians USA" and would earn commissions on every candle sold and would benefit from every candle sold. (Id. at 6.) However, Michael Baker testified that, as of April of 2010, there were only two interactions with St. Killian: (1) a telephone conversation with Jim Ryan which lasted five to seven minutes, and (2) an e-mail from Mr. Barrett which discussed St. Killian's product and scheduled a meeting for May of 2010. (Exh. 6.) By April of 2010, the principals of the two companies had not yet met each other, and PB&S had not even seen a demonstration of St. Killian's product.  The parties had not agreed on any material terms.

In further support of its argument that an agreement was formed prior to January of 2012, PB&S attempts to rely on statements in e-mail messages that were sent on May 27, 2010 and June 5, 2010. In the e-mail from May of 2010, St. Killian stated that PB&S "will benefit from every candle sold in the North

American Market."[5] (Exh. 6). In the e-mail from June of 2010, St. Killian stated "[w]e want Bakers to be Killians USA and every candle sold [by] your company should get commission just like our agent Jim Ryan. . . ." (Exh. 7.) Neither e-mail specifies the amount of the commission or the benefit that PB&S would receive from every candle sold. The e-mails are insufficient to demonstrate the existence of a binding agreement. *See* Roh, 2009 WL 3347105, at *3 (D. Conn. Oct. 14, 2009).

In further support of the argument that an agreement existed sometime prior to January of 2012, PB&S relies on an e-mail that Mr. Barrett sent PB&S on July 20, 2010, after the parties met on July 15, 2010. (Exh. 9.) The e-mail purports to contain a "general understanding" of what the parties discussed on July 15, 2010. (Id.)  Mr. Baker described the meeting on July 15 as a "note taking session of kind of hopes." (Tr. 12/1/21 at 64-65)(emphasis added). Sean Baker testified that the meeting included a general discussion about structure pricing but "nothing was set in stone of course." (Tr. 11/30/21 at 145.)

---

[5] The e-mail from May of 2010 was sent after the parties had their first meeting, which is also the first time Michael Baker saw St. Killians' product. Mr. Baker testified that, after the meeting, he told his family members about St. Killian's product, and they were "interested in looking at it deeper. And we all agreed that we would." (Tr. 11/30/21 at 19) (emphasis added) The fact that PB&S was still evaluating the product shows that a binding agreement had not yet been reached.

Relying on (a) Mr. Barrett's testimony that he intended to follow-up on the ten items that were listed in the e-mail, (2) the fact that PB&S began serving as a dealer for St. Killian around the same time,[6] and (3) an e-mail, from August 16, 2010, in which Mr. Barrett tells Sean Baker that St. Killian would prepare draft copies of contracts, PB&S argues that this proves that the parties were operating under an agreement. (Dkt. #200 at 6.) However, the e-mail from August 16, 2010 states "Contracts: we will prepare <u>draft copies</u> for us to navigate through and <u>come up with the best</u> for a long-term business relationship." (Exh. 12)(emphasis added). This suggests that there would be more than one draft contract and the parties would need to review those drafts to determine which would be best. The e-mail does not purport to state or summarize any material terms of an alleged agreement.

Next, PB&S notes that in October of 2010, St. Killian submitted a report to St. Patrick's Cathedral, which referred to PB&S as "authorized dealers." (Dkt. #200 at 7; Exh. 3.) Aside from referring to PB&S as an authorized dealer, the report does not contain any material terms of an agreement between PB&S and

---

[6] As discussed later, the parties continued negotiating the ten items that were mentioned in the e-mail, dated July 20, 2010, for several more months.

St. Killian.[7] PB&S asserts that if PB&S "was the authorized dealer for St. Patrick's Cathedral, that is a contractual relationship, that carries the obligation of good faith and fair dealing." (Dkt. #200 at 7, n.3.) PB&S then argues that "St. Killian evaded the spirit of that bargain by selling directly to St. Patrick's Cathedral for 9 cents less per candle." (Id.) There are several problems with this argument.

First, although PB&S asserts that being St. Killian's authorized dealer for St. Patrick's Cathedral was a contractual relationship, Mr. Barrett testified that St. Killian had twelve "dealers" and none had contracts. (Tr. 12/3/21 PM at 60, 70-71.) Given the nature of the dealer relationship, Mr. Barrett testified that St. Killian did not have contracts with its dealers. (Tr. 12/3/21 PM at 70-71.) Since PB&S was going to be St. Killian's first and only "exclusive distributor," a contract was necessary. (Id.) Unlike St. Killian's other dealers, PB&S would have the exclusive right to distribute St. Killian's products in the six states that make up New England. (Tr. 12/3/21 PM 71-72.) In those six states, PB&S would have no

_____

[7] See Suffield Development Assocs. Ltd Partnership v. Society for Savings, 708 A.2d 1361, 1366 (Conn. 1998)(quoting Westbrook v. Times-Star Co., 191 A. 91, 94 (Conn. 1937))("We have also stated that 'the memorandum appears [to be] no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms,' the plaintiff has failed to prove the existence of an agreement.").

competition from St. Killian's other dealers.[8] (Id.)  Although PB&S argues that the dealer relationship is a contractual relationship, PB&S has not identified any of the material terms of the alleged contractual relationship. The evidence shows that dealers simply purchase candles from St. Killian and then sell them for a profit.[9] (Tr. 12/3/21 PM at 15, 60.)

The documents which refer to PB&S as an authorized dealer for St. Patrick's Cathedral were created before the Cathedral stopped buying products from PB&S. PB&S cites those documents and relies on the phrase "authorized dealer" to suggest that St. Killian was only allowed to sell products to St. Patrick's Cathedral though PB&S (the authorized dealer for the Cathedral), even though the Cathedral had terminated its relationship with PB&S.  Thus, PB&S argues that by selling candles directly to the Cathedral, St. Killian evaded the spirit of the dealer agreement. However, St. Killian did not start selling candles

---

[8] Since PB&S would be operating in New England without competition, the written agreement imposed a sales quota on PB&S for New England. (Exh. A; Tr. 12/3/21 PM at 15-16.) No evidence was introduced to suggest that St. Killian's other dealers are required to sell or place a minimum amount of candle racks. Additionally, PB&S was going to receive a special price that would enable PB&S to earn a higher profit than St. Killian's other dealers. The special price was set forth in the written agreement and there was no evidence that it was agreed to prior to January of 2012.

[9] PB&S' Post-trial Brief emphasizes that PB&S was selling St. Killian products by August of 2010. (Dkt. #200 at 6.) However, according to Mr. Barrett's credible testimony, St. Killian's dealers regularly sell St. Killian's products and they do so without a contract.

directly to the Cathedral until several months _after_ the Cathedral ceased doing business with PB&S. There is no evidence that PB&S had the option of selling candles directly to the Cathedral after the Cathedral ended its relationship with PB&S.

PB&S has not presented any evidence that one of the terms of the alleged dealer agreement required St. Killian to force St. Patrick's Cathedral to resume buying candles from PB&S, despite having terminated its relationship with PB&S. PB&S did not introduce any evidence to support the notion that if a customer terminated its relationship with one of St. Killian's authorized dealers, the alleged "dealer agreement" prohibited St. Killian from servicing the customer itself.[10]

The argument that St. Killian evaded the spirit of the agreement by selling candles directly to the Cathedral is further undermined by a memo that PB&S sent to St. Killian on October 28, 2011.  The memo, which was created before the parties signed the written agreement, proposed options to help reduce the financial harm that PB&S was experiencing due to the loss of the Cathedral's account. One option was for PB&S to be

> a servicing agent that delivers candles and keeps racks in top shape but does not invoice, negotiate price. [PB&S] would be on call for all needs in regards [sic] to the St. Killian product at St. Patrick's Cathedral.

---

[10] After St. Patrick's Cathedral stopped buying products from PB&S, the Cathedral did not start buying those products from St. Killian. The Cathedral switched to AGCC and then, months later, switched from AGCC to St. Killian. PB&S never acknowledges this fact but also never disputes it.

> For this service [PB&S] would receive a commission that will be determined.

(Exh. W)(Emphasis added.) In other words, under PB&S' proposal, St. Killian would sell products directly to the Cathedral and PB&S would be on-call to service the account for St. Killian and receive a commission. This is precisely the type of arrangement St. Killian ended up giving PB&S (*See infra* Note 12.)

The memo, dated October 28, 2011, also undermines PB&S' argument that an agreement was reached prior to January 28, 2012. The memo demonstrates that, as of October 28, 2011, the parties were still discussing and negotiating some of the items that were mentioned in the e-mail dated July 20, 2010. In the memo, Sean and Michael Baker wrote

> It was initially discussed that [PB&S] would help St. Killian's attract and market the product to other dealers in the U.S. market. Dealers who would have had a long standing and trusting relationship for decades. For these efforts it was discussed that [PB&S] would receive ½ cent per candle for candles sold by dealers.
>
> If this is not to be the case why not and what would be considered a fair and attractive alternative plan?

(Exh. W)(emphasis added.) As an alternative plan, Sean and Michael Baker proposed that "PB&S receive vastly lower pricing than the rest of the U.S. market" and that "PB&S receives ½ – 1 cent on all dealers candle sales in the New England and Tristate area as well as Maroney's and all original group members." (Id.) The memo ended by stating that "we feel that the consideration

of this compensation package would only enhance the motivation and excitement.  Thank you for your consideration." (Id.) As the e-mail and Sean Baker's testimony confirmed, the parties were still discussing material terms as of October 28, 2011. (Tr. 12/1/21 at 81.)

The agreement, dated January 28, 2012, provided at least two important benefits for PB&S: (1) an exclusive territory in which PB&S would have no competition from St. Killian's other dealers, and (2) a special price that would enable PB&S to earn a higher profit than St. Killian's other dealers. (Tr. 12/3/21 at 15-16.)  PB&S has not offered any evidence to show that, prior to January 28, 2012, the parties had agreed on (1) the number of candles PB&S would need to place in churches in New England, in exchange for having New England as an exclusive territory, or (2) PB&S' special price.

PB&S has failed to establish the existence of an agreement prior to January 28, 2012.

2. The express agreement dated January 28, 2012

The intent of the parties as expressed in a contract "is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.... [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.... Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its

terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity.... Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms."

Connecticut Light & Power Co. v. Lighthouse Landings, Inc., 900 A.2d 1242, 1253 (Conn. 2006)(citation omitted); see also Penske Truck Leasing Co., L.P. v. Safeco Ins. Co. of Illinois, 457 F. Supp. 3d 148, 151 (D. Conn. 2020).

The parties agree that there is a written agreement dated January 28, 2012. However, the parties disagree on some of the terms. During trial, witnesses for both parties testified about the negotiations that led up to the agreement and the meaning of the final terms.[11]  However, except for the handwritten note at the bottom of the written agreement, the Court finds that the language of the agreement is clear and unambiguous.

---

[11] PB&S objected to Mr. Barrett's testimony about the meaning of certain terms in the agreement. As noted during the trial, witnesses for both parties provided such testimony. "[P]arol evidence is admissible (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral, oral agreement that does not vary the terms of the writing; (3) to add a missing term in a writing that indicates on its face that it does not set forth the complete agreement; and (4) to show mistake or fraud." Chapco, Inc. v. Hot Tub Prod., LLC, No. MMXCV166016697S, 2017 WL 5178594, at *5 (Conn. Super. Ct. Sept. 28, 2017).  Since (1), (2), and (3) arguably applied, the Court allowed each party to testify about the meaning of certain terms.

### a. The Provision Requiring the Collection of Waste Wax

In its post-trial brief, PB&S argues that the collection of waste wax from St. Patrick's Cathedral was never part of the agreement. PB&S argues that the handwritten note that Michael Baker inserted at the end of the agreement states the actual agreement regarding the payment of one cent per candle. PB&S argues that the "January Agreement granted [PB&S] exclusivity in New England and a one cent commission on every candle sold to St. Patrick's Cathedral, among other things. The January Agreement did not require [PB&S] to be a garbage collector for waste wax, as St. Killian contends." (Dkt. #200 at 8.)

However, Michael Baker's handwritten note does not purport to be the agreement. The note states that a "[n]ew agreement on .1 per candle for St. Patrick's Cathedral will follow." (Exh. A)(emphasis added.) This plainly shows that the parties reached an agreement to agree, and the new agreement would soon follow.

At trial, Michael Baker testified that before he added the handwritten note, the parties had discussed the idea of PB&S collecting waste wax from the Cathedral, but it did not make business sense. (Tr. 11/30/21 at 81.) However, none of the correspondence indicates that PB&S ever told St. Killian that PB&S was unwilling to collect the waste wax. Indeed, the correspondence shows otherwise.

In February of 2012, Mr. Barrett sent an e-mail to PB&S clearly stating that PB&S would "initially receive USD $0.01 (1 U.S. cent) for every candle sold to St. Patrick's Cathedral in recompense for your help with the St. Patrick's Cathedral account and in particular for collecting and recycling their waste wax." (Exh. EE)(emphasis added).[12] There is no evidence that anyone at PB&S ever disagreed with or tried to correct Mr. Barrett's articulation of the agreement. (Tr. 12/1/21 at 73.)

Ten days after Mr. Barrett told Michael and Sean Baker that the payment of one cent per candle required PB&S to collect the waste wax from St. Patrick's Cathedral, Mr. Barrett sent an e-mail to Sean and Michael Baker which discussed the logistics of collecting the waste wax from the Cathedral. (Exh. HH.) The e-mail informed them that Mr. Donohue was going to organize the large bin bags and once that happened, "we are ready to start getting things moving to have the wax collected every week."

---

[12] Approximately five months earlier, in October 2011, Sean and Michael Baker prepared a summary of a conversation with Mr. Murphy and Mr. Barrett. (Exh. W.) One option that PB&S proposed to help reduce the loss that PB&S was experiencing due to the loss of the Cathedral's account was for PB&S to "be on call for all needs in regards to the St. Killian product at St. Patrick's Cathedral. For this [PB&S] would receive a commission that will be determined later." (Exh. W at 1)(emphasis added.)  The agreement described in Mr. Barrett's email from February 15, 2012, seems to fall within those parameters (*i.e.*, in exchange for being on call to collect the waste wax from St. Patrick's Cathedral, PB&S would receive a commission.)

(Id.)[13] Sean Baker replied "I am still waiting to hear from the wax salvage companies. I will also wait to hear from you about St. Patrick's."  (Exh. II.)

After Mr. Barrett stated the terms of the "one cent per candle" agreement, none of the subsequent e-mails suggest that PB&S disagreed with his statement. PB&S never said that the payment of one cent per candle was not supposed to be tied to the collection of waste wax.[14]  After Mr. Barrett stated the terms of the agreement, none of the subsequent e-mails mention any further need to clarify or finalize the "new agreement" that was mentioned in the handwritten note in the agreement.

---

[13] Mr. Barrett testified that St. Killian needed someone to collect the waste wax from the Cathedral and it seemed like a good way for Sean or Michael Baker to be present at the Cathedral and start rebuilding their relationship with the Cathedral. (Tr. 12/3/21 PM at 22.) PB&S would pick up the waste wax, keep it, and sell it to a recycling company. (Id.) Mr. Barrett testified that waste wax is worth about 500 Euros per ton in Europe, plus PB&S would receive the additional compensation of one cent per candle from St. Killian. (Id.)

[14] At trial, Sean Baker explained that he did not respond to Mr. Barrett's statement that the payment of one cent per candle was tied to the collection of the waste wax "[b]ecause it was never agreed upon." (Tr. 12/1/21 at 30.) This explanation makes no sense. Mr. Barrett's e-mail allegedly misstated the terms of the agreement in a material way, but Sean Baker made no attempt to correct the mistake. Shortly thereafter, when Mr. Barrett sent another e-mail discussing the logistics for collecting the waste wax, Mr. Baker, again, made no attempt to correct the alleged mistake. Instead, he told Mr. Barrett that he was still waiting to hear from wax salvage companies. (Exh. II.) Sean Baker later testified that when he told Mr. Barrett that he was waiting to hear from wax salvage companies, PB&S was, in fact, planning on collecting the waste wax. (Tr. 12/1/21 at 74.)

It is undisputed that PB&S never collected the waste wax at St. Patrick's Cathedral. (Tr. 11/30/21 at 91; 12/2/21 at 120-21; Tr. 12/3/21 PM at 23.) Thus, to the extent that the commission structure of the written agreement required PB&S to collect the waste wax to earn the payment of one cent per candle, the Court finds that St. Killian did not breach the agreement by failing to pay such compensation.

### b. The Termination of the Agreement

St. Killian asserts that, on September 14, 2012, it sent a letter terminating the agreement due to (1) the amount of money that PB&S owed St. Killian and (2) PB&S' failure to place the required 250 candle racks in churches in New England. Mr. Barrett testified that the letter terminated the agreement dated January 28, 2012, but that PB&S could remain a non-exclusive dealer for St. Killian. (12/3/21 PM at 74.)

PB&S asserts that it never received the termination letter and was never informed that the agreement had been terminated. Therefore, PB&S argues that the "termination letter is a fiction, and its fabrication is merely further evidence of bad faith." (Dkt. #200 at 10 n. 5.) PB&S argues that if the letter is valid, it proves that St. Killian breached the agreement because the requirement of placing 250 candle racks was for the year 2012 and St. Killian terminated the agreement with 3 ½

months left in 2012, thereby depriving PB&S of the opportunity to meet the requirement. (Dkt. #200 at 9.)

In response, Mr. Barrett testified that the agreement required PB&S to place 250 racks in churches in New England, not just sell 250 racks. (Tr. 12/3/21 PM at 16-17, 66; Exh. A.) Mr. Barrett testified that, even though there were 3 ½ months left in 2012, there was no sign that PB&S had enough orders to get anywhere close to 250 racks.[15] (Tr. 12/3/21 PM at 16-17, 66.)

Even after the trial and the filing of the post-trial briefs, numerous questions remain unanswered regarding the termination of the agreement. PB&S claims it never learned of the termination and continued operating as though the agreement was still in effect. In fact, Mr. Threlkeld testified that PB&S thought it was still operating under the agreement on October 23, 2012, which is more than one month after the date of the termination letter. (Tr. 12/2/21 at 39-40.) Notably, PB&S never explains how or when it learned that the agreement had been terminated. Thus, it is unclear how the termination letter adversely affected PB&S' ability to meet the requirement of

---

[15]It is undisputed that, as of September of 2012, PB&S had not placed 250 candle racks in New England churches and had not appointed any dealers in New England to help achieve the requirement. (Tr. 11/30/21 at 99 and 107; Tr. 12/1/21 at 66; Tr. 12/3/21 PM at 15-16.) However, the evidence shows that in mid-September of 2012, unrelated to the termination letter, PB&S halted business with St. Killian and stopped processing orders. No evidence was introduced to show that PB&S resumed processing orders before the end of 2012, or at any time.

placing 250 candle racks in churches by the end of 2012.[16] If
PB&S thought the contract was still in effect and St. Killian
did not say or do anything to make PB&S think otherwise, it is
unclear what prevented PB&S from continuing to sell St. Killian
products and meet the requirement of placing 250 candle racks.

Some of St. Killian's arguments raise questions too. St.
Killian claims it terminated the agreement on September 14,
2012. However, as noted earlier, Mr. Threlkeld sent an e-mail on
October 23, 2012, advising Mr. Barrett that he would like both
companies to get on the same page as quickly as possible but "in
the interim we will rely on the agreement signed in Dublin
during Mike and Sean's visit in January of this year."  (Exh.
EEE.) Mr. Barrett did not respond to the e-mail by telling Mr.
Threlkeld that the agreement supposedly had been terminated.

Several of the e-mails that post-date the termination
letter create the impression that the written agreement had been
terminated. For instance, on October 11, 2012, Mr. Barrett e-
mailed Mr. Threlkeld and told him that St. Killian was looking
forward to the "new opportunity" with PB&S for New England.
(Exh. BBB at 4.) Mr. Barrett's e-mail added that one of the

---

[16] According to an e-mail that Sean Baker sent in September of 2012,
PB&S had only sold 90 candle racks by September 8, 2012. (Exh. QQ)("We
currently have 76 actively burning racks with 14 pre-sold and dozens
of strong leads for new placements.") Thus, PB&S had only achieved
about 36% of the annual goal with one quarter of the year remaining.

topics they discussed was that the exclusivity for New England carries the expectation of a minimum quantity of sales for New England, so perhaps Mr. Threlkeld and his team could give that some thought. (Id.) However, if the agreement from January of 2012 was supposedly still in effect, a quota for the exclusive territory of New England already existed (*i.e.*, PB&S had to achieve 250 candle racks). (Exh. A.) Additionally, Mr. Threlkeld sent an e-mail on October 19, 2022, which told Mr. Barrett "[w]e have to tie up the loose ends so that the parties understand what they can expect from each other rather than attempt to operate on a vague best efforts basis which is the proverbial moving target." (Exh. BBB at 4.) This seems like an odd comment if the agreement from January of 2012, was still in effect. Finally, Mr. Threlkeld's e-mail from October 23, 2012, tells Mr. Barrett that <u>in the interim</u>, the parties should continue to rely on the agreement that was signed in January of 2012. (Exh. EEE.) If the agreement was still in effect, it would be unnecessary to state that the parties should rely on it. And why would they only rely on it in the interim?[17]

---

[17] Mr. Threlkeld addressed one potentially problematic e-mail during his direct exam. On October 19, 2022, Mr. Threlkeld stated that he had questions about the proposed contract that Mr. Barrett and Sean Baker were discussing. (Exh. AAA.) When asked why he would make such a comment if the agreement from January of 2012 was still in effect, Mr. Threlkeld testified that his comment about the contract referred to a particular shipment delivery. (Tr. 12/2/21 at 36.) However, Mr. Threlkeld did not explain the other e-mails, including the e-mail that discussed the sales quota for the exclusive territory of New England.

The Court need not address whether the alleged mailing of the termination letter breached the agreement or the covenant of good faith and fair dealing because PB&S has not shown that the letter had any effect. PB&S claims it never received actual or constructive notice that the agreement had been terminated. (Tr. 11/30/21 at 95, 111.) Thus, PB&S has not shown what, if anything, changed due to the termination letter. PB&S has never asserted that (1) at some point in 2012, St. Killian told PB&S to stop selling St. Killian's products in New England or anywhere else; or (2) that St. Killian allowed another one of its dealers to service PB&S' exclusive territory of New England in 2012; or (3) that PB&S sold products in 2012 but then St. Killian refused to honor PB&S' special price. PB&S has never indicated how it was allegedly harmed by relying on the belief that the agreement was still in effect after September of 2012.

The fact that PB&S' new management team decided to stop processing future orders from St. Killian, in mid-September of 2012, further complicates PB&S' claim. According to Sean Baker, this decision was unrelated to the termination letter that PB&S claims it never received. (Tr. 12/1/21 at 55-57.) PB&S decided to halt business with St. Killian until the dispute over the container was resolved. (Tr. 12/1/21 at 106.) However, PB&S never asserted that the dispute over the container was ever

resolved. PB&S also never offered evidence that it resumed doing

business with St. Killian. Under the agreement, PB&S was St.

Killian's exclusive distributor for New England, and in return,

PB&S was required to place 250 candle racks in churches in New

England. It is unclear why PB&S' decision to stop processing

orders for St. Killian would not violate PB&S' obligations under

the agreement.  However, the Court need not address that issue.

### B. Breach of the covenant of good faith and fair dealing

Under Connecticut law,

> it is axiomatic that the ... duty of good faith and fair
> dealing is a covenant implied into a contract or a
> contractual relationship. In other words, every contract
> carries an implied duty requiring that neither party do
> anything that will injure the right of the other to
> receive the benefits of the agreement. The covenant of
> good faith and fair dealing presupposes that the terms
> and purpose of the contract are agreed upon by the
> parties and that what is in dispute is a party's
> discretionary application or interpretation of a
> contract term.

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d

382, 387-88 (Conn. 2004)(internal quotation and citations

omitted).

To establish a breach of the covenant of good faith and

fair dealing, PB&S must prove three elements: (1) PB&S and St.

Killian were parties to an agreement under which PB&S reasonably

expected to receive certain benefits; (2) St. Killian engaged in

conduct that injured PB&S' right to receive some or all of the

benefits of the agreement; and (3) St. Killian was acting in bad

faith when it committed the acts by which it injured PB&S' right to receive the benefits that PB&S reasonably expected to receive under the agreement. <u>Franco v. Yale Univ.</u>, 238 F. Supp. 2d 449, 455 (D. Conn. 2002), <u>aff'd,</u> 80 F. App'x 707 (2d Cir. 2003).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose." <u>De La Concha of Hartford, Inc.</u>, 849 A.2d at 388 (citation omitted).

PB&S argues that St. Killian acted in bad faith by making false promises from the outset for the purpose of landing St. Patrick's Cathedral as an account and then, after landing the account, St. Killian convinced the Cathedral to stop doing business with PB&S. (Dkt. #200 at 3.) PB&S argues that even if the Court finds that St. Killian did not convince St. Patrick's Cathedral to stop doing business with PB&S, St. Killian evaded the spirit of the agreement with PB&S by stepping into PB&S' shoes and acting as the authorized dealer for St. Patrick's Cathedral. (Dkt. #200 at 3.)  PB&S argues that the bad faith motive was money. (Dkt. #200 at 3.)

1. <u>The termination of the relationship between PB&S and St. Patrick's Cathedral</u>

The Court will start by addressing the argument that St. Killian convinced the Cathedral to stop doing business with PB&S. The evidence does not support the allegation.

At trial, Mr. Donohue provided detailed testimony about the efforts he took to help reduce costs for St. Patrick's Cathedral in anticipation of the $200,000,000 renovation project. There is no evidence that Mr. Donohue was motivated by anything other than a desire to reduce costs when he recommended that the Cathedral stop buying products from PB&S. More importantly, there is no evidence that St. Killian asked Mr. Donohue to make the recommendation. Mr. Donohue credibly testified that St. Killian played no role in the Cathedral's decision to stop buying products from PB&S.[18] (Tr. 12/2/21 at 126-27.)

Mr. Donohue testified that he concluded that AGCC's prices were significantly lower than PB&S' prices. Therefore, he recommended switching from PB&S to AGCC. Exhibit 29 partially corroborates Mr. Donohue's testimony. Exhibit 29 is an e-mail that Mr. Donohue sent to the Cathedral's building manager on

---

[18]Additionally, the timeline contradicts PB&S' theory that after landing St. Patrick's Cathedral as an account, St. Killian convinced the Cathedral to terminate its relationship with PB&S. As noted, immediately after the Cathedral stopped buying candles and glass from PB&S, it started buying them from AGCC, not St. Killian. St, Killian did not land the Cathedral's account until months later, when the Cathedral stopped buying from AGCC and switched to St. Killian.

October 14, 2010. The e-mail instructs the building manager to look for a new glass company to keep PB&S on its toes.[19] (Exh. 29.) The timing of the e-mail coincides with the date that the Cathedral stopped buying candles and glass from PB&S (*i.e.*, October or November of 2010). (Tr. 12/1/21 at 12-13.)

PB&S argues that Mr. Donohue's assertion that the decision to stop buying products from PB&S was a cost-based decision is not credible because the money that the Cathedral saved by becoming a "factory direct" account of St. Killian was minimal. PB&S' argument is inconsistent with the timeline and Mr. Donohue's actual testimony. When the Cathedral made the cost-based decision to stop buying products from PB&S, it switched to AGCC, not St. Killian. Eventually, the Cathedral switched from AGCC to St. Killian, but that was based on yet a different cost-based analysis. Mr. Donohue testified that one of the main reasons for switching to St. Killian was the significant savings on the price of glass for votive candles. (Tr. 12/2/21 at 149-50.)  Mr. Donohue explained that even though St. Patrick's Cathedral was paying slightly more money for St. Killian's candles, the overall cost decreased by about $75,000 per year.

---

[19] Sean Baker testified that Mr. Donohue was constantly complaining about prices and his complaints were not limited to candles. (Tr. 11/30/21 at 152; Tr. 12/2/21 at 96-104, 111.) He also testified that Mr. Donohue was known for complaining about prices on most anything. (Tr. 11/30/21 at 152.) This further corroborates Mr. Donohue's testimony that he was motivated by a desire to reduce costs.

The Cathedral had been paying about $75,000 per year for glass for the votive candles, an expense that is not incurred with the use of the St. Killian candle burning system. Therefore, the overall cost for the St. Killian burning system was about $75,000 less per year for the Cathedral. (Tr. 12/2/21 at 165.) Mr. Donohue's explanation is credible and believable.

In further support of its argument that St. Killian asked the Cathedral to stop buying products from PB&S, PB&S notes that Mr. Donohue's wife eventually obtained a job with St. Killian. (Tr. 12/2/21 at 123.) However, Mr. Donohue's wife did not obtain the job until early 2019 – more than eight years after St. Patrick's Cathedral stopped doing business with PB&S. (Tr. 12/2/21 at 123.) PB&S failed to introduce any evidence that, in 2010, Mr. Donohue and St. Killian had agreed that if Mr. Donohue could convince the Cathedral to stop buying products from PB&S, St. Killian would reward Mr. Donohue by giving his wife a job eight or nine years later. Additionally, the eight-year gap between the date that the Cathedral stopped doing business with PB&S and the date that St. Killian hired Mr. Donohue's wife is too attenuated to raise any inference of a causal connection between the two events. *See e.g.,* Green v. Mount Sinai Health Sys., Inc., 826 F. App'x 124, 126 (2d Cir. 2020)(quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, (2001)("To show the inference of retaliation from temporal proximity alone,

the temporal proximity must be 'very close,' and periods greater than 20 months, by themselves, suggest 'no causality at all.').

As the facts show, even after St. Patrick's Cathedral stopped doing business with PB&S in late 2010, St. Killian continued to negotiate, and eventually signed, a written agreement in January of 2012 with PB&S which provided PB&S with an opportunity to earn significant compensation. The agreement made PB&S St. Killian's exclusive distributor in New England, thereby allowing PB&S to sell St. Killian's products in six states without any competition from St. Killian's other dealers. (Tr. 12/31/21 PM at 72.) PB&S was also given special pricing that enabled PB&S to earn a larger profit than any other St. Killian dealer in the country.[20] (Tr. 12/3/21 at 73.) It bears repeating that all of these benefits were set forth in an agreement that was signed after St. Patrick's Cathedral stopped doing business with PB&S. This undermines PB&S' argument.

Finally, the contemporaneous correspondence shows that, both before and after the parties signed their agreement, the parties strategized on ways to try to get PB&S back into the Cathedral. The Court has already discussed the correspondence but exhibits Q, W, X, EE, HH, and II illustrate the point.

---

[20] On October 28, 2011, which was well-after St. Patrick's Cathedral stopped buying products from PB&S, PB&S asked St. Killian for vastly lower pricing than the rest of the U.S. market. (Exh. W.) Thereafter, in the written agreement, dated January 28, 2012, St. Killian gave PB&S such vastly lower pricing.

PB&S has failed to prove that St. Killian acted in bad faith by allegedly convincing the Cathedral to stop doing business with PB&S.

### 2. Whether St. Killian acted in bad faith by selling candles directly to St. Patrick's Cathedral

As an alternative theory for proving bad faith, PB&S argues that St. Killian evaded the spirit of the agreement by stepping into PB&S' shoes and acting as the authorized dealer for St. Patrick's Cathedral by selling candles directly to the Cathedral. The Court disagrees.

A claim for breach of the covenant of good faith and fair dealing requires proof that the parties had a contract or contractual relationship. Wurtzebach v. Henderson Glob. Invs. (N. Am.), Inc., No. 3:09CV366(AWT), 2011 WL 13233773, at *2 (D. Conn. Nov. 17, 2011). It is undisputed that St. Killian started selling candles directly to the Cathedral before the parties entered into their agreement on January 28, 2012. To the extent that PB&S argues that an agreement was formed prior to January of 2012, the Court has already rejected that argument.

Second, to the extent that PB&S argues that St. Killian wrongfully stepped into PB&S' shoes by selling candles directly to the Cathedral, there is no evidence that PB&S had the option of selling candles directly to the Cathedral on the date in

question. The Cathedral switched from PB&S to AGCC months earlier.[21]

Finally, as noted earlier, the memo that Sean and Michael Baker sent St. Killian on October 28, 2011, contained a proposal for St. Killian to sell products directly to the Cathedral and for PB&S to be on-call to service the account. This shows that PB&S had no problem with St. Killian selling products directly to the Cathedral.

### C. Unjust Enrichment

"The elements of [an unjust enrichment claim] are that, '(1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment.'" <u>Lieberman v.</u>

---

[21] Although PB&S argues that its role as St. Killian's authorized dealer for St. Patrick's Cathedral was a contractual relationship that pre-dated January 28, 2012, PB&S has not stated the material terms of the alleged contract.

> Most courts decline to find a breach of the covenant [of good faith and fair dealing] apart from a breach of an express contract term. 23 S. Williston, supra, § 63:22, at p. 516. Stated otherwise, "the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty." *Id.*

<u>Landry v. Spitz</u>, 925 A.2d 334, 344 (2007). PB&S has not shown that St. Killian breached a specific term of the contract that was allegedly formed before January 2012. PB&S has offered no evidence that a non-exclusive dealer agreement somehow prohibits St. Killian from selling products directly to a customer after the customer has terminated its relationship with St. Killian's authorized dealer.

Emigrant Mortg. Co., 436 F. Supp. 2d 357, 366 (D. Conn. 2006)(quoting Kull v. Davidoff of Geneva, No. 01-CIV-4821, 2004 WL 1418088, at *15 (S.D.N.Y. June 23, 2004)).  "[T]he determination of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings for the trial court that are subject only to a limited scope of review on appeal." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., et al, 649 A.2d 518, 522 (1994).

> The remedy of unjust enrichment provides that a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties.  However, where an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable.

Alstom Power, Inc. v. Schwing Am., Inc., No. 3:04 CV 1311 JBA, 2006 WL 2642412, at *5 (D. Conn. Sept. 14, 2006)(internal citations omitted).[22] "Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations. Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." Polverari v. Peatt, 614 A.2d 484, 489 (Conn. App. Ct. 1992) (internal quotations and citations omitted).

---

[22] In Alstom Power, the Court found that there was an enforceable written contract but the breach of contract action was barred by the statute of limitations. "Therefore, due to the existence of a written contract, plaintiff cannot recover on an unjust enrichment theory." Alstom Power, 2006 WL 2642412, at *6 (D. Conn. Sept. 14, 2006).

PB&S argues that unjust enrichment applies if the written agreement does not provide a remedy for PB&S delivering the St. Patrick's Cathedral account to St. Killian. (Dkt. #200 at 3.) The Court has already found that, to earn one cent per candle, the parties' agreement required PB&S to collect the waste wax from St. Patrick's Cathedral. The Court further finds that this arrangement was also intended to compensate PB&S for helping St. Killian land St. Patrick's Cathedral as an account.

The e-mail, dated February 15, 2012, provides that PB&S would receive one cent for every candle sold to St. Patrick's Cathedral "in recompense for [PB&S'] help with the St. Patrick's Cathedral account and in particular for collecting and recycling their waste wax." Aside from potentially collecting the waste wax from the Cathedral, PB&S was not doing anything for St. Patrick's Cathedral as of February 15, 2012. Therefore, the reference to PB&S' "help with the St. Patrick's Cathedral account" likely refers to PB&S' efforts to help St. Killian land St. Patrick's Cathedral as an account.  Additionally, although Sean Baker denied that the collection of the waste wax was part of the agreement for one cent per candle, he testified that the agreement for one cent per candle was intended to compensate PB&S for "everything leading up to this point, the introduction,

the introduction to PEP, the introduction to the industry, our pain staking efforts."[23] (Tr. 12/1/21 37.)

At trial, Mr. Barrett testified that the written agreement also provided another form of compensation for PB&S' efforts to help St. Killian land St. Patrick's Cathedral as an account. Mr. Barrett testified that part of the reason St. Killian took the unprecedented step of making PB&S an exclusive distributor for New England was in consideration for PB&S' efforts to help St. Killian get its foot in the door of St. Patrick's Cathedral. (Tr. 12/3/21 at 72.) None of the PB&S witnesses contradicted this assertion.

The Court finds that the written agreement created methods for compensating PB&S for its efforts to help St. Killian land St. Patrick's Cathedral as an account.  Thus, the agreement controls the subject matter of PB&S' unjust enrichment claim and, therefore, any claim by PB&S for unjust enrichment must fail.

## IV.   CONCLUSION

For the reasons set forth herein, plaintiff has failed to meet its burden of proof on any of the claims pled in the complaint.  Therefore, judgement shall enter in favor of the defendant on all counts.

_____

[23] PB&S' claim for unjust enrichment also seeks compensation for introducing St. Killian to Pep Industries. The Court finds that this conduct was also covered by the same one cent per candle arrangement.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of appeals from this judgement. *See* 28 U.S.C. § 636(c)(3).

SO ORDERED at Hartford, Connecticut, this 3rd day of February, 2023.

/s/
_____

Robert A. Richardson
United States Magistrate Judge